**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Sarah N. Westcot (State Bar No. 264916)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
          swestcot@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
369 Lexington Avenue, 10th Floor
New York, NY  10017
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK IACCINO and CHRIS LEATON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>USPLABS, LLC and VITAMIN SHOPPE, INC.,<br><br>Defendants. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs Frank Iaccino and Chris Leaton ("Plaintiffs"), by their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.        This is a class action lawsuit on behalf of purchasers of the Jack3d "pre-workout" and OxyELITE Pro "fat burning" dietary supplements (the "Products"), which are marketed by USPLabs, LLC ("USPLabs") and Vitamin Shoppe, Inc. ("Vitamin Shoppe") (collectively, "Defendants") as safe and effective for consumer use as pre-workout and weight management supplements, respectively.  In fact, the Products are not safe and effective, because the active ingredient in both Jack3d and OxyELITE Pro is a dangerous amphetamine-like stimulant that poses a serious health risk and has potentially life-threatening side effects.  This synthetic stimulant, which Defendants falsely claim is derived from the geranium plant, has many chemical names, including dimethylelamylamine, 1,3-dimethylpentylamine, 2-amino-4-methylhexane, and 4-methyl-2-hexylamine (collectively, "DMAA").

2.        The Products' labeling and advertising represents that the Products (a) are a "Super Thermogenic,"[1] (b) are a "Pre-Exercise CNS-Carnosine-ATP Augmentor," (c) "may produce an intense sensation of _focus, energy, & awareness_" (emphasis original), and (d) provide "Ultra-Intense Muscle-Gorging Strength, Energy, Power & Endurance" (the "Express Warranties" or "Misrepresentations").  Each of the Misrepresentations is false, misleading, and unsubstantiated.  There is no competent and reliable scientific evidence supporting any of these claims.

3.        Plaintiffs purchased the Products in reliance on the Misrepresentations and on Defendants' claims that the Products are safe, effective, and legal dietary supplements, which they are not.

---

[1]     "Thermogenics" are sometimes also referred to as "fat burners."  "Thermogenesis" in this context is understood as a metabolic process during which the body burns calories to produce heat.

4.      DMAA was patented and submitted to the FDA for approval as a decongestant in the 1940s.[2]  The compound had an approved new drug application and was sold as an over-the-counter drug until 1983.  DMAA is a vasoconstrictor and a central nervous system stimulant which is on the World Anti-Doping Agency ("WADA") and Major League Baseball ("MLB") lists of banned substances.  DMAA is related to amphetamine and can cause high blood pressure, nausea, cerebral hemorrhage, stroke, and in serious cases can be fatal.  DMAA is banned in Canada, New Zealand, Finland, and Ireland.  Moreover, the United States military has removed DMAA-containing supplements from all military exchanges worldwide following the sudden deaths of two soldiers who were users of DMAA pre-workout supplements.[3]

5.      On April 24, 2012, the United States Food and Drug Administration ("FDA") issued a Warning Letter to USPLabs stating that the Products "are deemed to be adulterated under 21 U.S.C. 342(f)" because of the presence of DMAA, and demanded that USPLabs immediately cease distribution of the Products.[4]

6.      Defendants fail to inform consumers that DMAA is a dangerous central nervous system stimulant that is banned by WADA, MLB, Canada, New Zealand, Finland, Ireland and the U.S. Military.

7.      In addition, although Defendants represent that the DMAA in the Products is derived from "Geranium," multiple recent scientific studies confirm that DMAA cannot be extracted from the geranium plant, and that all DMAA on the market is in fact synthetic and completely manufactured in laboratories.

8.      Because DMAA is a wholly synthetic substance, it is not a "dietary ingredient," and Defendants' Products are therefore not "dietary supplements," as those terms are defined by the Food, Drug & Cosmetic Act ("FDCA") and rules and regulations adopted by the FDA – all of

---

[2]     DMAA was patented by Eli Lilly and Company in 1944 (U.S. Patent # 2,350,318) and marketed for sale as a drug under the brand name Forthane for the use in the relief of nasal congestion.

[3]     Both soldiers had heart attacks during fitness exercises.  *See* http://www.nytimes.com/2012/02/03/business/army-studies-workout-supplements-after-2-deaths.html (last visited July 17, 2012).

[4]     Available at http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2012/ucm302167.htm (last visited July 16, 2012).

which are expressly incorporated into California's Sherman Food, Drug, & Cosmetic Act (the "Sherman Law"), Health & Safety Code ("H&S") §§ 108975-111915.

9.    California's Sherman Law expressly incorporates all food labeling requirements set forth in the FDCA (*see* Cal. H&S Code § 110100(a)), and further provides that any food is misbranded if its nutrition labeling does not conform to FDCA requirements (*see* Cal. H&S Code §§ 110665, 110670, 110673).

10.    Furthermore, because DMAA was previously patented and marketed by Ely Lilly as a drug for the treatment of various medical conditions and disorders, it cannot now be considered a dietary ingredient that can properly be included in a dietary supplement.

11.    Defendants falsely advertise the Products as safe, effective dietary supplements. However, Defendants fail to inform consumers that the Products do not meet the definition of a "dietary supplement," and that DMAA does not meet the definition of a "dietary ingredient," as those terms have been defined and adopted by California's Sherman Law.

12.    Defendants' Misrepresentations and use of DMAA in the Products renders the Products worthless.

13.    Plaintiffs are purchasers of the Products who assert claims for violation of the Magnuson Moss Warranty Act, for breach of express warranty, for breach of the implied warranty of merchantability, for unjust enrichment, and for violation of the consumer protection laws of the State of California.

## PARTIES

14.    Plaintiff Chris Leaton is a citizen of California who resides in Riverside County, California.  In or about April 2012, Mr. Leaton purchased OxyELITE Pro for personal consumer use from a Vitamin Shoppe retail store in Temecula, California.  Mr. Leaton purchased OxyELITE Pro in reliance on Defendants' Misrepresentations, including those in its advertisements and labeling that OxyELITE Pro was a "Super Thermogenic" that would be safe and effective as a weight management supplement.  These representations were substantial factors influencing Mr. Leaton's decision to purchase OxyELITE Pro.  Mr. Leaton would not have purchased OxyELITE

Pro had he known that it was not safe and effective as represented, and he suffered injury in fact and lost money as a result of Defendants' deceptive, unfair, and fraudulent practices described herein.

15.     On or about June 27, 2012, prior to filing this action, Mr. Leaton, by and through his counsel, provided Defendant USPLabs with written notice of his claims pursuant to 15 U.S.C. § 2310(e) and California Civil Code § 1782.  Mr. Leaton also notified USPLabs that he was acting on behalf of a class defined as all persons in the United States who purchased OxyELITE Pro, and a subclass of class members who purchased OxyELITE Pro in California.  This notification is attached hereto as Exhibit A.

16.     On or about June 29, 2012, prior to filing this action, Mr. Leaton, by and through his counsel, provided Defendant Vitamin Shoppe with written notice of his claims pursuant to 15 U.S.C. § 2310(e) and California Civil Code § 1782.  Mr. Leaton also notified Vitamin Shoppe that he was acting on behalf of a class defined as all persons in the United States who purchased OxyELITE Pro, and a subclass of class members who purchased OxyELITE Pro in California. This notification is attached hereto as Exhibit B.

17.     Plaintiff Frank Iaccino is a citizen of California who resides in Sacramento County, California.  During the spring season of 2010, Mr. Iaccino purchased Jack3d for personal consumer use from a Vitamin Shoppe retail store in Roseville, California.  Mr. Iaccino purchased Jack3d in reliance on Defendants' Misrepresentations, including those in its advertisements and labeling that Jack3d was a safe and effective pre-workout supplement.  These representations were substantial factors influencing Mr. Iaccino's decision to purchase Jack3d Pro.  Mr. Iaccino would not have purchased Jack3d had he known that it was not safe and effective as represented, and he suffered injury in fact and lost money as a result of Defendants' deceptive, unfair, and fraudulent practices described herein.

18.     On or about July 10, 2012, prior to filing this action, Mr. Iaccino, by and through his counsel, provided Defendant USPLabs with written notice of his claims pursuant to 15 U.S.C. § 2310(e) and California Civil Code § 1782.  Mr. Iaccino also notified USPLabs that he was acting

on behalf of a class defined as all persons in the United States who purchased Jack3d, and a subclass of class members who purchased Jack3d in California. This notification is attached hereto as Exhibit C.

19.     Defendant USPLabs, LLC, is a Texas limited liability company with its principal place of business at 10761 King William Drive, Dallas, Texas 75220.

20.     Defendant Vitamin Shoppe, Inc. is a New York corporation with its principal place of business at 2101 91st Street, North Bergen, New Jersey 07047.

21.     Each of the Defendants acted jointly to perpetrate the acts describe herein. At all times relevant to the allegations in this matter, each Defendant acted in concert with the other Defendant, with the knowledge and approval of and/or as the agent of the other Defendant within the course and scope of the agency, regarding the acts and omissions alleged.

22.     Moreover, at all relevant times hereto, Defendant Vitamin Shoppe affirmatively participated in and/or adopted the false and misleading advertising and marketing claims about the Products. Vitamin Shoppe is responsible for (1) displaying the Products with their false claims on the labeling and packaging on its store shelves and website, (2) utilizing false and misleading in-store advertisements for the Products, (3) reviewing and approving false and misleading advertising materials for promoting the sale of the Products, and (4) selling the Products to consumers.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question). This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

24.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and Plaintiffs and most members of the proposed class are citizens of states different from the state of Defendants.

25.     This Court has personal jurisdiction over Defendants because Defendants are authorized to do business in California, intentionally avail themselves of the markets in California

through the promotion, marketing, and sale of merchandise, and conduct substantial business within California such that Defendants have significant continuous and pervasive contacts with the State of California sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

26.     Venue is proper in this Court under 28 U.S.C. § 1391(a) and (b) because a substantial part of the events or omissions giving rise to these claims occurred in this District and because the Court has personal jurisdiction over Defendants.

### FACTS COMMON TO ALL CAUSES OF ACTION

**A.     The Products**

27.     Jack3d and OxyELITE Pro are top selling products for USPLabs, and sales of the Products provide substantial revenue for Vitamin Shoppe.

28.     Jack3d is a "pre-workout" supplement marketed for body building.  A true and correct copy of the Jack3d packaging is attached hereto as Exhibit D.

29.     OxyELITE Pro is a weight-management supplement marketed as a "Super Thermogenic."  A true and correct copy of the OxyELITE Pro packaging is attached hereto as Exhibit E.

30.     Defendants sell the Products for approximately $44.99 to $59.99 each, based on the false claims that they are safe and effective dietary supplements.

**B.      False Claims Of Safety And Efficacy**

31.     Defendants' marketing and promotion of the Products includes numerous unsubstantiated, false, and misleading claims concerning the Products' safety and efficacy. Defendants sell the Products through a deceptive marketing campaign claiming that they are safe and effective supplements that can be used as a pre-workout supplement to provide "Ultra-Intense Muscle Gorging Strength, Energy, Power & Endurance" (Jack3d) and as a weight control supplement to "promote extreme thermogenesis" (OxyELITE Pro).

32.     Defendants also refer to "university studies" and other research that purports to support their claims.  These claims include:  (a) "USPLabs Athletes – Real People Real Results;"

(b) "Jack3d is THE original University Studied Ultra-Concentrated Pre-Workout…;" (c) "Jack3d is now backed by multiple University studies, including double-blind, placebo-controlled research;" (d) "Of course, Jack3d has already been 'put to the test' by lifters all around the globe…;" (e) "Needless to say, if you want the best, look no further than Jack3d – proven in the real world & in the lab…;" (f) "NOTHING delivers consistent workout domination for such a great price – NOTHING!;" (g) "Perfectly-executed matrix of energy-spawning, muscle-engorging compounds found only in Jack3d;' and (h) "Introducing a burner coined the  "Super Thermogenic" by those familiar with its effectiveness… It's called OxyELITE Pro & It's absolutely unmatched!"

33.     In reality, there is no competent and reliable scientific evidence, based on university testing or otherwise, that supports these claims.  The "tests" and "studies" Defendants rely on yielded results that were the product of lab instrument contamination, and they used sample sizes too small to show consistent results.  Moreover, results of the purported tests and studies were reported inaccurately, and some were produced on the same day by the same open-access online journal, Nutrition and Metabolic Insights.

34.     Defendants' Misrepresentations regarding the safety, efficacy, and legality of the Products were designed to, and did, lead Plaintiffs and members of the Class to believe that the Products were not only effective, but safe and legal as well.  Plaintiffs and Class would never have purchased the Products but for Defendants' Misrepresentations.

### C.     The Products Are Not Dietary Supplements

35.     Defendants fail to inform consumers that the Products do not meet the definition of a "dietary supplement," and that DMAA, the active ingredient in both Products, does not meet the FDA's definition of a "dietary ingredient."  The FDA defines a dietary supplement as "a product (other than tobacco) intended to supplement the diet" that contains one or more enumerated "dietary ingredients."  *See*  21 U.S.C. 321 (ff)(1).  The dietary ingredients in such supplements may include a number of naturally occurring substances such as vitamins, minerals, herbs or other botanicals, amino acids, and substances such as enzymes, organ tissues, glandulars, and metabolites.  Dietary substances can also be extracts or concentrates.  *Id*.  A purely synthetic

substance cannot be a dietary ingredient.  *See* 21 U.S.C. 321(ff)(1)(F); *see also* FDA "Draft Guidance for Industry:  Dietary Ingredient Notifications and Related Issues," Section IV.D.2.

36.     Recent studies have shown that DMAA is not a natural constituent of the geranium plant, and that all DMAA on the market is synthetic.  *See* American Herbal Products Association: Review of Research Shows DMAA Not Naturally from Geranium, July 2012 ("[T]here are no known-published reports indicating that this is a natural product.  Any labeling stating that it is naturally occurring in geranium, or any other natural source, would need appropriate scientific evidence to support it.  None has yet been found in the public domain"); Pelargonium Oil and Methyl Hexaneamine (MHA):  Analytical Approaches Supporting the Absence of MHA in Authenticated *Pelargonium graveolens* Plant Material and Oil, JOURNAL OF ANALYTICAL TOXICOLOGY, June 25, 2012 (finding no DMAA in a variety of geranium samples); 1,3-Dimethylamylamine (DMAA) in supplements and geranium products:  natural or synthetic?, DRUG TESTING AND ANALYSIS, July 12, 2012 (testing detected no DMAA in eight geranium oil samples from different regions).

37.     Because Defendants' DMAA is manufactured synthetically, it is unlawful as a dietary ingredient pursuant to 21 U.S.C. § 321(ff)(1)(F), as clarified in the FDA's "Draft Guidance for Industry:  Dietary Ingredient Notifications and Related Issues," Section IV.D.2.

38.     Even assuming *arguendo* that Defendants' DMAA qualifies as a dietary ingredient, it is a new dietary ingredient pursuant to 21 U.S.C. § 350b(c) because it was not marketed as a dietary ingredient in the United States before October 15, 1994.  And Defendants have not submitted proper notification of the presence of the new dietary ingredient DMAA to the FDA as required by 21 U.S.C. § 350b(a)(2).  Therefore, as noted in the FDA's Warning Letter of April 24, 2012, the Products are adulterated under 21 U.S.C. 342(f).

39.     Defendants' Misrepresentations regarding the status of the Products as safe and effective dietary supplements were designed to, and did, induce Plaintiffs and the Class members to purchase the Products.  Plaintiffs and Class members would never have purchased the Products but

for Defendants' Misrepresentations, and Plaintiffs and Class members would never have purchased the Products had they know that they were not safe and effective dietary supplements.

### D.    Plaintiffs' Claims Against Defendants

40.    Plaintiffs are residents of California who purchased the Products in reliance on Defendants' claims that the Products were safe and effective dietary supplements.

41.    At the time Plaintiffs purchased the Products, they were not aware, and the Product packaging and advertising did not disclose, that DMAA is a potentially dangerous synthetic stimulant similar to amphetamine that has been associated with serious injury and death; that DMAA is banned by the WADA, USADA, and MLB; that DMAA is banned in Canada, New Zealand, Ireland, Finland, and on all U.S. military exchanges; that DMAA does not fit within the definition of a "dietary ingredient" and the Products do not fit within the FDA definition of a "dietary supplement;" that DMAA was once marketed as a drug; or that using DMAA can cause life-threatening side effects such as stroke and heart attack.

42.    Plaintiffs relied upon and were misled by Defendants' Misrepresentations about the Products.  The false claims relied upon by Plaintiffs include but are not limited to the claims that the Products are a "Super Thermogenic," are a "Pre-Exercise CNS-Carnosine-ATP Augmentor," that "may produce an intense sensation of focus, energy, & awareness" and provide "Ultra-Intense Muscle-Gorging Strength, Energy, Power & Endurance."

43.    Plaintiffs relied on these Misrepresentations in deciding to purchase the Products. Because Defendants' representations about the safety and efficacy of the Products were false, Plaintiffs' expectations were not met.  Had Plaintiffs known that the Products are not safe, natural, and effective dietary supplements as advertised, they would never have purchased the Products.

44.    Defendants' representations regarding the safety and efficacy of the Products were material to Plaintiffs and Class members at the time that they purchased the Products.  Plaintiffs and members of the Class did not receive the benefit of the bargain from their purchases because they paid for Products that were represented as safe and effective, but which were in fact neither safe nor effective.  Accordingly, Plaintiffs and members of the Class suffered injury in fact and lost

money as a result of Defendants' Misrepresentations.  But for Defendants' Misrepresentations, Plaintiff and members of the Class would not have purchased the Products.

## CLASS ACTION ALLEGATIONS

45.     Plaintiffs seek to represent a class defined as all persons in the United States who purchased the Products for personal or household use, and not for resale or distribution.  Excluded from the Class are governmental entities, Defendants, and Defendants' affiliates, parents, subsidiaries, employees, officers, and directors.  Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

46.     Plaintiffs also seek to represent a subclass defined as all members of the Class who purchased the Products within the state of California (the "California Subclass").

47.     Members of the Class and the California Subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and California Subclass number in excess of tens of thousands.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery of Defendants' records.  Class members may be notified of the pendency of this action by mail, email, and/or publication.

48.     Common questions of law and fact exist as to all Class and California Subclass members and predominate over questions affecting only individual Class and California Subclass members.  These common legal and factual questions include, but are not limited to (a) whether Defendants' labeling, marketing, and promotion of the Products are false, misleading, and unsubstantiated; (b) whether Defendants' conduct violates the Magnuson-Moss Warranty Act and California state law breach of warranty claims; (c) whether Defendants' conduct violates California's Consumers Legal Remedies Act; (d) whether Defendants' conduct violates California's Unfair Competition Law or False Advertising Law; and (e) whether, as a result of Defendant's misconduct, Plaintiffs and the Class and California Subclass are entitled to damages, restitution, equitable relief and other relief, and the amount and nature of such relief.

49.     Plaintiffs' claims are typical of the claims of the proposed Class and California Subclass in that Plaintiffs were exposed to Defendants' false, misleading, and unsubstantiated marketing and promotional materials, purchased the Mislabeled Products, and suffered losses as a result of their purchases.  Each Class and California Subclass member was subjected to the same conduct, was harmed in the same way, and has claims for relief under the same legal theories.

50.     Plaintiffs are adequate representatives of the Class and California Subclass because their interests do not conflict with the interests of the Class and California Subclass members they seek to represent, they have retained counsel competent and experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class and California Subclass members will be fairly and adequately protected by Plaintiffs and their counsel.

51.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class and California Subclass members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

52.     Unless a class is certified, Defendants will retain monies received as a result of their conduct that were taken from Plaintiffs and proposed Class and California Subclass members. Unless a class-wide injunction is issued, Defendants will continue to commit the violations of law alleged, and the members of the Class, California Subclass, and the general public will continue to be misled.

CLASS ACTION COMPLAINT

11

## COUNT I

**Violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301, *et seq*.**

53.     Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

54.     This Count I is brought against Defendants by Plaintiffs individually and on behalf of the Class.

55.     The Products are consumer products as defined in 15 U.S.C. §2301(1).

56.     Plaintiffs and the Class members are consumers as defined in 15 U.S.C. §2301(3).

57.     Defendants are suppliers and warrantors as defined in 15 U.S.C. §2301(4) and (5).

58.     In connection with the sale of the Products, Defendants issued written warranties as defined in 15 U.S.C. §2301(6) in its product marketing and advertising, as well as on the Product labels, in the form of the Express Warranties that the Products are safe and effective for use as dietary supplements.

59.     In fact, the Products do not conform to the Express Warranties because they are not safe and effective for use as dietary supplements, and each of the Express Warranties is false, misleading, and unsubstantiated, and there is no competent and reliable scientific evidence supporting any of those statements.

60.     By reason of Defendants' breach of the Express Warranties, they violated the statutory rights due Plaintiffs and the Class members pursuant to the Magnuson-Moss Warranty Act, thereby damaging Plaintiff and the Class members.  15 U.S.C. §§ 2301, *et seq.*, thereby damaging Plaintiffs and Class members.

61.     Plaintiffs and the Class members were injured as a direct and proximate result of Defendants' breach because they would not have purchased the Products if the true facts concerning their safety and efficacy had been known.

## COUNT II

### Breach of Express Warranty

62.     Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

63.     This Count II is brought against Defendants by Plaintiffs individually and on behalf of the Class.

64.     Plaintiffs and each Class member formed a contract with Defendants at the time Plaintiffs and the other members of the Class purchased the Products.  The terms of that contract include the promises and affirmations of fact relating to the Mislabeled Products' characteristics and purported safety and efficacy as reflected in the Misrepresentations on Defendants' product labels and through their marketing campaigns as described above.  This product labeling and advertising became part of the basis of the bargain and is part of a standardized contract between Plaintiffs and the members of the Class on the one hand, and Defendants on the other, and thus constituted an express warranty.

65.     Defendants sold the goods to Plaintiffs and the other Class members, who bought the goods from Defendants.

66.     Defendants breached the terms of this contract, including the express warranties, because the goods were in fact not safe and effective as represented, and therefore the express warranties were false, misleading, and unsubstantiated.  As a result of this breach, Plaintiffs and the Class did not receive goods as warranted by Defendants.

67.     Plaintiffs and the Class were injured as a direct and proximate result of Defendants' breach of contract and its warranties because they would not have purchased the Mislabeled Products if the true facts concerning their safety and efficacy had been known.

## COUNT III

### Breach of Implied Warranty of Merchantability

68.     Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth here.

69.     This Count III is brought against Defendants by Plaintiffs individually and on behalf of the Class.

70.     Defendants, through the acts and omissions set forth herein, in their sale, marketing, and promotion of the Products, made representations to Plaintiffs and the Class that the Products were safe and effective pre-workout and weight control dietary supplements, among other representations, as described above.  Plaintiffs and the Class bought the Products that are manufactured, advertised and sold by Defendants.

71.     Defendants are merchants with respect to the goods of this kind that were sold to Plaintiffs and the Class and there was in the sale to Plaintiffs and other consumers an implied warranty that the Products were merchantable.

72.     However, Defendants breached that warranty implied in the contract for the sale of goods in that the Products are not safe and effective pre-workout and weight control dietary supplements, as set forth in detail herein.

73.     As a result of Defendants' conduct, Plaintiffs and the Class did not receive goods as impliedly warranted by Defendants to be merchantable in that they did not conform to the promises and affirmations made on the container or label of the goods.

74.     Plaintiffs and the Class have sustained damages as a proximate result of the foregoing breach of implied warranty in an amount to be determined at trial.

**COUNT IV**
**Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code §§ 1750, *et seq.***
**(Injunctive Relief Only)**

75.     Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

76.     This Count IV is brought against Defendants by Plaintiffs individually and on behalf of the California Subclass.

77.     CLRA § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not

have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have." Defendants violated this provision by making the Misrepresentations about the Products.

78.     CLRA § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Defendants violated this provision by making the Misrepresentations about the Products.

79.     CLRA § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised." Defendants violated this provision by making the Misrepresentations about the Products.

80.     CLRA § 1770(a)(16) prohibits "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Defendants violated this provision by making the Misrepresentations about the Products.

81.     Plaintiffs and the California Subclass members suffered injuries caused by Defendants' Misrepresentations because they would not have purchased the Mislabeled Products had they known the true facts concerning their safety and efficacy.

82.     On or about June 27, 2012, prior to filing this action, a CLRA notice letter was served on USPLabs which complies in all respects with California Civil Code § 1782(a). Mr. Leaton sent USPLabs a letter via certified mail, return receipt requested, advising USPLabs that it is in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom. A true and correct copy of this letter is attached hereto as Exhibit A.

83.     On or about June 29, 2012, prior to filing this action, a CLRA notice letter was served on Vitamin Shoppe which complies in all respects with California Civil Code § 1782(a). Mr. Leaton sent Vitamin Shoppe a letter via certified mail, return receipt requested, advising Vitamin Shoppe that it is in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom. A true and correct copy of this letter is attached hereto as Exhibit B.

84.     On or about July 10, 2012, prior to filing this action, a CLRA notice letter was served on USPLabs which complies in all respects with California Civil Code § 1782(a).  Mr. Iaccino sent USPLabs a letter via certified mail, return receipt requested, advising USPLabs that it is in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  A true and correct copy of Mr. Iaccino's CLRA letter is attached hereto as Exhibit C.

85.     Wherefore, Plaintiffs presently seek only injunctive relief for these violations of the CLRA.  However, in the event that the requested relief is not provided, Plaintiffs will amend this Complaint to include a request for monetary damages under Count IV pursuant to the timeframe set forth in the CLRA.

### COUNT V
**Violation of California's Unfair Competition Law ("UCL"),**
**California Business & Professions Code §§ 17200, *et seq.***

86.     Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

87.     This Count V is brought against Defendants by Plaintiffs individually and on behalf of the California Subclass.

88.     Defendants are subject to the Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200 *et seq.*  The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

89.     Defendants' Misrepresentations and other conduct, described herein, violated the "unlawful" prong of the UCL by violating the MMWA as described herein; the CLRA as described herein; the California False Advertising Law ("FAL") as described herein; Cal. H&S Code §§ 108975-111915; and DSHEA and regulations promulgated thereunder, including but not limited to 21 U.S.C. §§ 321 and 343(r)(6).

90.     Defendants' Misrepresentations and other conduct, described herein, violated the "unfair" prong of the UCL in that Defendants' conduct is substantially injurious to consumers,

offends public policy, and is immoral, unethical, oppressive and unscrupulous as the gravity of the conduct outweighs any alleged benefits.

91.     Defendants' conduct, described herein, violated the "fraudulent" prong of the UCL by making the Misrepresentations about the Products.

92.     Plaintiffs and the California Subclass members lost money or property as a result of Defendants' UCL violations because they would not have purchased the Products had they known the true facts concerning their safety and efficacy.

## COUNT VI
### Violation of California's False Advertising Law ("FAL"),
### Calif. Business & Professions Code §§17500, *et seq.*

93.     Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

94.     This Count VI is brought against Defendants by Plaintiffs individually and on behalf of the members of the California Subclass.

95.      California's False Advertising Law, Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, ... in any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

96.      Defendants committed acts of false advertising, as defined by §17500, by making the Misrepresentations about the Products.

97.      Defendants knew or should have known, through the exercise of reasonable care that their Misrepresentations about the Products were untrue and misleading.

98.     Defendants' actions in violation of § 17500 were false and misleading such that the general public is and was likely to be deceived.

99.     Plaintiffs and the California Subclass members lost money or property as a result of Defendants' FAL violations because they would not have purchased the Products had they known the true facts concerning their safety and efficacy.

## COUNT VII

### Unjust Enrichment / Common Law Restitution

100.     Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

101.     This Count VII is brought against Defendants by Plaintiffs individually and on behalf of the members of the Class.

102.     Plaintiffs and the Class members conferred benefits on Defendants by purchasing the Products.

103.     Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs' and the Class members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because Defendants misrepresented that the Products were safe and effective for use as dietary supplements when in fact they are not, which caused injuries to Plaintiffs and the Class members because they would not have purchased the Products if the true facts about their safety and efficacy had been known.

104.     Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiffs and the Class members is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the Class members for their unjust enrichment, as ordered by the Court.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the members of the proposed Class and California Subclass pray: (a) for all forms of relief set forth above, (b) for an order certifying the proposed Class and California Subclass and appointing Plaintiffs and their undersigned counsel of record to represent the proposed classes, (c) for compensatory and punitive damages, (d) for costs of suit herein; (e) for both pre- and post-judgment interest on any amounts

awarded, (f) for payment of reasonable attorneys' fees, and (g) for such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  July 18, 2012                    Respectfully Submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ L. Timothy Fisher*
          L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Sarah N. Westcot (State Bar No. 264916)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
          swestcot@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
369 Lexington Avenue, 10th Floor
New York, NY  10017
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com

*Attorneys for Plaintiffs*

1    I, Frank Iaccino, declare as follows:

2        1.      I am a plaintiff in this action and a citizen of the State of California. I have personal

3    knowledge of the facts stated herein and, if called as a witness, I could and would testify

4    competently thereto.

5        2.      The complaint filed in this action is filed in the proper place for trial under

6    California Civil Code Section 1780(d) in that Defendants conduct a substantial amount of business

7    in this District.

8        3.      While living in California, I purchased Jack3d for personal consumer use. I read the

9    label on the Jack3d packaging, and purchased Jack3d in reliance on the claims that it was a safe

10   and effective "Pre-exercise CNS-Carnosine-ATP Augmentor," that it "may produce an intense

11   sensation of focus, energy, & awareness" (emphasis original), and that "its key ingredients may

12

13   allow for workout domination in conjunction with proper training and diet." The representations

14   on the label were substantial factors influencing my decision to purchase Jack3d. I would not have

15   purchased Jack3d had I known that it was not a safe and effective pre-workout dietary supplement

16   as represented.

17       I declare under the penalty of perjury under the laws of the State of California that the

18   foregoing is true and correct, executed on July /7, 2012 at Rancho Murieta, California.

19

20

21

22                                                        FRANK IACCINO

23

24

25

26

27

28

1      I, Chris Leaton, declare as follows:

2      1.     I am a plaintiff in this action and a citizen of the State of California. I have personal

3 knowledge of the facts stated herein and, if called as a witness, I could and would testify

4 competently thereto.

5      2.     The complaint filed in this action is filed in the proper place for trial under

6 California Civil Code Section 1780(d) in that Defendants conduct a substantial amount of business

7 in this District.

8      3.     While living in California, I purchased OxyELITE Pro for personal consumer use

9 from a Vitamin Shoppe retail store in Temecula, California. I read the label on the OxyELITE Pro

10 packaging, and purchased OxyELITE Pro in reliance on the claims that it was a safe and effective

11 "Super Thermogenic." The representations on the label were substantial factors influencing my

12 decision to purchase OxyELITE Pro. 1 would not have purchased OxyELITE Pro had I known that

14 it was not a safe and effective treatment for weight loss as represented.

15      I declare under the penalty of perjury under the laws of the State of California that the

16 foregoing is true and correct, executed on July 17 , 2012 at Temecula, California.

CHRIS LEATON

**EXHIBIT A**

# BURSOR & FISHER
P.A.

1990 NORTH CALIFORNIA BLVD.                                    L. TIMOTHY FISHER
SUITE 940                                                      Tel: 925.300.4455
WALNUT CREEK, CA 94596                                         Fax: 925.407.2700
www.bursor.com                                                 ltfisher@bursor.com

June 27, 2012

*__Via Certified Mail - Return Receipt Requested__*

USPlabs, LLC
10761 King Williams Dr.
Dallas, TX 75220

Re:    Violation of Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*; Violation of
       California Civil Code § 1782

To Whom It May Concern:

       This letter serves as a notice and demand for corrective action on behalf of our client,
Chris Leaton, and all other persons similarly situated, arising from breaches of warranty under
the Magnuson-Moss Warranty Act and violations of numerous provisions of California law
including the Consumers Legal Remedies Act, Civil Code § 1770, including but not limited to
subsections a(5), (7) and (9) by USPlabs, LLC ("USPlabs").

       This notice concerns the USPlabs product OxyELITE Pro, which is labeled and/or
promoted as a dietary supplement.  The labeling for this product declares
1,3-dimethylamylamine HCl ("DMAA") as a dietary ingredient.  On April 24, 2012 the Food
and Drug Administration ("FDA") sent a Warning Letter to USPlabs notifying it that DMAA is
subject to the notification requirement in 21 U.S.C. 350b(a)(2) and 21 CFR 190.6, and that
because the required notification has not been submitted, OxyELITE Pro is adulterated under 21
U.S.C. 342(f)(1)(B) and 350b(a).  The April 24, 2012 FDA Warning Letter also states, "Oxy
Elite Pro and Jack3d are adulterated under 21 U.S.C. 342(f)(1)(B) and 350b(a) because they
contain a new dietary ingredient for which there is inadequate information to provide reasonable
assurance that such ingredient does not present a significant or unreasonable risk of injury.
Introduction of such product into interstate commerce is prohibited under 21 U.S.C. 331(a) and
(v)."

       Mr. Leaton purchased OxyELITE Pro for personal consumer use.  At the time that he
purchased OxyELITE Pro, Mr. Leaton did not know that OxyELITE Pro was not being sold
legally or that there was inadequate information to provide reasonable assurance that its DMAA
does not present a significant or unreasonable risk of injury.  Mr. Leaton would not have
purchased OxyELITE Pro had he known the true facts about the product.

       Mr. Leaton is acting on behalf of a class defined as all persons in the United States who
purchased OxyELITE Pro, and on behalf of a subclass of persons who purchased OxyELITE Pro
in the State of California.

To cure this defect, we hereby demand that USPlabs immediately: (1) cease and desist from further sales of OxyELITE Pro; (2) issue an immediate recall of OxyELITE Pro; and (3) make full restitution to all purchasers of OxyELITE Pro of all purchase money obtained from sales thereof.

It is further demanded that USPlabs preserve all documents and other evidence that refer or relate to any of the above-described practices including, but not limited to, the following:

1.      All documents concerning the advertisement, marketing and/or sale of OxyELITE Pro;

2.      All communications with customers concerning complaints or comments concerning OxyELITE Pro;

3.      All communications with the FDA concerning OxyELITE Pro;

4.      All documents concerning the sales volumes of OxyELITE Pro; and

5.      All documents concerning the identities of consumers who purchased OxyELITE Pro.

Please comply with this demand within 30 days from receipt of this letter.

We are willing to negotiate with USPlabs to attempt to resolve the demands asserted in this letter. If USPlabs wishes to enter into such discussions, please contact me immediately. If I do not hear from you promptly, I will conclude that you are not interested in resolving this dispute short of litigation. If USPlabs contends that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents immediately upon receipt of this letter, but in no event later than 30 days from the date of receipt.

Very truly yours,

L. Timothy Fisher
ltfisher@bursor.com

**EXHIBIT B**

# BURSOR & FISHER
### P.A.

**1990 North California Blvd.**
**Suite 940**
**Walnut Creek, CA 94596**
**www.bursor.com**

**L. Timothy Fisher**
**Tel: 925.300.4455**
**Fax: 925.407.2700**
**ltfisher@bursor.com**

June 29, 2012

***Via Certified Mail - Return Receipt Requested***

Vitamin Shoppe, Inc.
2101 91st Street
North Bergen, NJ 07047

Re:     Violation of Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*; Violation of
        California Civil Code § 1782

To Whom It May Concern:

     This letter serves as a notice and demand for corrective action on behalf of our client,
Chris Leaton, and all other persons similarly situated, arising from breaches of warranty under
the Magnuson-Moss Warranty Act and violations of numerous provisions of California law
including the Consumers Legal Remedies Act, Civil Code § 1770, including but not limited to
subsections a(5), (7) and (9) by Vitamin Shoppe, Inc. ("Vitamin Shoppe").

     This notice concerns Vitamin Shoppe's marketing and sale of the USPlabs product
OxyELITE Pro, which is labeled and/or promoted as a dietary supplement.  The labeling for this
product declares 1,3-dimethylamylamine HCl ("DMAA") as a dietary ingredient.  On April 24,
2012 the Food and Drug Administration ("FDA") sent a Warning Letter to USPlabs notifying it
that DMAA is subject to the notification requirement in 21 U.S.C. 350b(a)(2) and 21 CFR 190.6,
and that because the required notification has not been submitted, OxyELITE Pro is adulterated
under 21 U.S.C. 342(f)(1)(B) and 350b(a).  The April 24, 2012 FDA Warning Letter also states,
"Oxy Elite Pro and Jack3d are adulterated under 21 U.S.C. 342(f)(1)(B) and 350b(a) because
they contain a new dietary ingredient for which there is inadequate information to provide
reasonable assurance that such ingredient does not present a significant or unreasonable risk of
injury.  Introduction of such product into interstate commerce is prohibited under 21 U.S.C.
331(a) and (v)."

     Vitamin Shoppe has marketed, sold, and continues to sell OxyELITE Pro.

     Mr. Leaton purchased OxyELITE Pro at a Vitamin Shoppe retail store in Temecula,
California for personal consumer use.  At the time that he purchased OxyELITE Pro, Mr. Leaton
did not know that OxyELITE Pro was not being sold legally or that there was inadequate
information to provide reasonable assurance that its DMAA does not present a significant or
unreasonable risk of injury.  Mr. Leaton would not have purchased OxyELITE Pro had he known
the true facts about the product.

Mr. Leaton is acting on behalf of a class defined as all persons in the United States who purchased OxyELITE Pro, and on behalf of a subclass of persons who purchased OxyELITE Pro in the State of California.

To cure this defect, we hereby demand that Vitamin Shoppe immediately:  (1) cease and desist from further sales of OxyELITE Pro; (2) issue an immediate recall of OxyELITE Pro; and (3) make full restitution to all purchasers of OxyELITE Pro of all purchase money obtained from sales thereof.

It is further demanded that Vitamin Shoppe preserve all documents and other evidence that refer or relate to any of the above-described practices including, but not limited to, the following:

     1.     All documents concerning the advertisement, marketing and/or sale of OxyELITE Pro;

     2.     All communications with customers concerning complaints or comments concerning OxyELITE Pro;

     3.     All communications with the FDA concerning OxyELITE Pro;

     4.     All documents concerning the sales volumes of OxyELITE Pro; and

     5.     All documents concerning the identities of consumers who purchased OxyELITE Pro.

Please comply with this demand within 30 days from receipt of this letter.

We are willing to negotiate with Vitamin Shoppe to attempt to resolve the demands asserted in this letter.  If Vitamin Shoppe wishes to enter into such discussions, please contact me immediately.  If I do not hear from you promptly, I will conclude that you are not interested in resolving this dispute short of litigation.  If Vitamin Shoppe contends that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents immediately upon receipt of this letter, but in no event later than 30 days from the date of receipt.

Very truly yours,

L. Timothy Fisher
ltfisher@bursor.com

**EXHIBIT C**

# BURSOR & FISHER

P.A.

1990 NORTH CALIFORNIA BLVD.
SUITE 940
WALNUT CREEK, CA 94596
www.bursor.com

L. TIMOTHY FISHER
Tel: 925.300.4455
Fax: 925.407.2700
ltfisher@bursor.com

July 10, 2012

*Via Certified Mail - Return Receipt Requested*

USPlabs, LLC
10761 King Williams Dr.
Dallas, TX 75220

Re:    Violation of Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*; Violation of
       California Civil Code § 1782

To Whom It May Concern:

       This letter serves as a notice and demand for corrective action on behalf of our client, Frank Iaccino, and all other persons similarly situated, arising from breaches of warranty under the Magnuson-Moss Warranty Act and violations of numerous provisions of California law including the Consumers Legal Remedies Act, Civil Code § 1770, including but not limited to subsections a(5), (7) and (9) by USPlabs, LLC ("USPlabs").

       This notice concerns the USPlabs product Jack3d, which is labeled and/or promoted as a dietary supplement.  The labeling for this product declares 1,3-dimethylamylamine HCl ("DMAA") as a dietary ingredient.  On April 24, 2012 the Food and Drug Administration ("FDA") sent a Warning Letter to USPlabs notifying it that DMAA is subject to the notification requirement in 21 U.S.C. 350b(a)(2) and 21 CFR 190.6, and that because the required notification has not been submitted, Jack3d is adulterated under 21 U.S.C. 342(f)(1)(B) and 350b(a).  The April 24, 2012 FDA Warning Letter also states, "Oxy Elite Pro and Jack3d are adulterated under 21 U.S.C. 342(f)(1)(B) and 350b(a) because they contain a new dietary ingredient for which there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of injury.  Introduction of such product into interstate commerce is prohibited under 21 U.S.C. 331(a) and (v)."

       Mr. Iaccino purchased Jack3d for personal consumer use.  At the time that he purchased Jack3d, Mr. Iaccino did not know that Jack3d was not being sold legally or that there was inadequate information to provide reasonable assurance that its DMAA does not present a significant or unreasonable risk of injury.  Mr. Iaccino would not have purchased Jack3d had he known the true facts about the product.

       Mr. Iaccino is acting on behalf of a class defined as all persons in the United States who purchased Jack3d, and on behalf of a subclass of persons who purchased Jack3d in the State of California.

To cure this defect, we hereby demand that USPlabs immediately:  (1) cease and desist from further sales of Jack3d; (2) issue an immediate recall of Jack3d; and (3) make full restitution to all purchasers of Jack3d of all purchase money obtained from sales thereof.

It is further demanded that USPlabs preserve all documents and other evidence that refer or relate to any of the above-described practices including, but not limited to, the following:

1.      All documents concerning the advertisement, marketing and/or sale of Jack3d;

2.      All communications with customers concerning complaints or comments concerning Jack3d;

3.      All communications with the FDA concerning Jack3d;

4.      All documents concerning the sales volumes of Jack3d; and

5.      All documents concerning the identities of consumers who purchased Jack3d.

Please comply with this demand within 30 days from receipt of this letter.

We are willing to negotiate with USPlabs to attempt to resolve the demands asserted in this letter.  If USPlabs wishes to enter into such discussions, please contact me immediately.  If I do not hear from you promptly, I will conclude that you are not interested in resolving this dispute short of litigation.  If USPlabs contends that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents immediately upon receipt of this letter, but in no event later than 30 days from the date of receipt.

Very truly yours,

L. Timothy Fisher
ltfisher@bursor.com

**EXHIBIT D**

**Directions:** As a dietary supplement, mix 1 Ultra-Concentrated scoop (5.5 grams) with 4-8 ounces of cold water and consume 30-45 minutes before beginning activity. This is to be done the first three (3) times using the product. Under no circumstances should the initial dose be exceeded or the warnings on this bottle be ignored. Beginning with the 4th time using the product, dose may be increased by, but not more than, ½ of a scoop (2.75 grams). The ideal individual dose for workout domination may vary between 1-3 scoops.

DO NOT EXCEED 3 SCOOPS IN ANY 24 HOUR PERIOD. DO NOT USE MORE THAN 5 DAYS OUT OF ANY 7 DAY PERIOD. Exceeding the recommended amounts or not following directions may lead to unwanted effects. Consume at least 125 fl. oz. of liquid per day for men and 91 fl. oz. of liquid per day for women while taking this product.

Contents may settle after shipping. **Shake container prior to each use to redistribute ingredients.** Moisture and humidity can cause clumping and discoloration. Store in cool dry place. Discard after expiration date.

L-009-02

**Warning** This product is only intended to be consumed by healthy adults 18 years of age or older. Before using this product consult with your physician if you are using any prescription or over the counter medication or if you have any pre-existing medical condition including but not limited to: high or low blood pressure, cardiac arrhythmia, stroke, heart, liver, kidney or thyroid disease, seizure disorder, psychiatric disease, diabetes, difficulty urinating due to prostate enlargement or if you are taking a MAOI (Monoamine Oxidase Inhibitor) or any other medication. This product contains caffeine and should not be taken by individuals wishing to eliminate this ingredient from their diet. Discontinue use 2 weeks prior to surgery. Do not use in combination with caffeine or any stimulants from other sources whatsoever, including but not limited to, coffee, tea, soda and other dietary supplements or medications. Do not combine with alcohol. Discontinue use and consult your health care professional if you experience any adverse reaction to this product. Do not exceed recommended serving. Do not use if safety seal is broken or missing. Do not use for more than 5 out of 7 consecutive days. KEEP OUT OF REACH OF CHILDREN.

**† These statements have not been evaluated by the Food and Drug Administration. This product is not intended to treat, diagnose, cure or prevent any disease.**



# USPlabs

## Jack3d™  45 ULTRA CONCENTRATED SCOOPS

### (Pre-Exercise CNS-Carnosine-ATP Augmentor)†

## UNIVERSITY STUDIED

This product may produce an intense sensation of focus, energy & awareness. In addition, its key ingredients may allow for workout domination in conjunction with proper training and diet. Use with caution under strict dosing protocols.

PRODUCT ID # 22980

FLAVOR: Lemon-Lime

**Net Wt 8.8 oz (250 g)**

## DIETARY SUPPLEMENT

# Supplement Facts

Serving Size 1 Scoop (5.55 g)
Servings Per Container: 45

| | Amount per serving | % Daily Value |
|---|---|---|
| Proprietary Blend | 4145.00 mg | * |

(Arginine Alpha-Ketoglutarate, Creatine Monohydrate, Beta Alanine (CarnoSyn®), Caffeine, 1,3-Dimethylamylamine HCl, Schisandra Chinensis (Berry) Extract (Standardized for Schizandrol A))

*Daily value not established

Other Ingredients: Citric Acid, Natural Lemon-Lime Flavor, Silicon Dioxide, Acesulfame-K, Sucralose, Vegetable Stearate, Sodium Copper Chlorophyllin (For Coloring).

Manufactured for USPlabs, LLC (Dallas, Texas 75220).

Questions, comments or concerns can be directed to our forums at: **www.usplabsdirect.com** or by phone at: **1-800-890-3067** (9-5 EST Mon-Fri)

This product is produced in a facility that processes Milk and Soy ingredients Do not use if you are, or may become, pregnant.

CarnoSyn® Natural Alternatives International (NAI) is the owner of patents 5,965,596, 6,172,098, 6,426,361, 6,680,294 and registered trademark CarnoSyn®.

**EXHIBIT E**

Directions for use: As a dietary supplement, begin by taking 1 capsule on an empty stomach 15-30 minutes before breakfast for the first three (3) days. An additional 1 capsule may be taken 5-6 hours later starting on day 4. Once the above steps have been taken, an additional capsule may be added to the morning dose. Under no circumstances should the initial dose be exceeded or the warnings on this bottle be ignored.

DO NOT USE PRODUCT FOR LONGER THAN 8 WEEKS FOLLOWED BY A SUBSEQUENT 4 WEEK BREAK. DO NOT EXCEED 3 CAPSULES IN ANY 24 HOUR PERIOD. Exceeding the recommended amounts or not following directions may lead to unwanted effects. Consume at least 125 Fl. Oz. of liquid per day for men and 91 Fl. Oz. of liquid per day for women while taking this product. Store in cool dry place. Discard after expiration date.

**WARNING:** This product is only intended to be consumed by healthy adults 18 years of age or older. Pregnant or nursing women should not use this product. Consult with your health care provider before using this product, especially if you are taking any prescription, over the counter medication, dietary supplement product or if you have any pre-existing medical condition including but not limited to: high or low blood pressure, cardiac arrhythmia, stroke, heart, liver, kidney or thyroid disease, seizure disorder, psychiatric disease, diabetes, difficulty urinating due to prostate enlargement or if you are taking a MAO-B inhibitor or any other medication, including but not limited to MAOIs, SSRIs or any other compounds with serotonergic activity. This product contains caffeine and should not be taken by individuals wishing to eliminate this ingredient from their diet. Discontinue use 2 weeks prior to surgery. Do not use in combination with caffeine or any stimulants from other sources whatsoever, including but not limited to, coffee, tea, soda and other dietary supplements or medications. Do not combine with alcohol. Discontinue use and immediately consult your health care professional if you experience any adverse reaction to this product. Do not exceed recommended serving. Do not use if safety seal is broken or missing. KEEP OUT OF REACH OF CHILDREN.

**† These statements have not been evaluated by the Food and Drug Administration. This product is not intended to treat, diagnose, cure or prevent any disease.**



**PHARMACIST FORMULATED**



USPlabs™

# OxyELITE Pro™

**Super** Thermogenic™†

## University Studied

OxyELITE Pro is Pharmacist-formulated & **must be used with extreme caution**, only by healthy adults capable of handling its true power. It is *mandatory* that users get clearance from their physician before use.

**DIETARY SUPPLEMENT**



**90 Capsules**

# Supplement Facts
Serving Size 1 Capsule

| | Amount per serving | % Daily Value |
|---|---|---|
| Proprietary Blend | 119.5 mg | * |
| Bauhinia Purpurea L.(Leaf and Pod) Extract, Bacopa (Leaf) (Bacopa Monnieri) Extract, 1,3-Dimethylamylamine HCl, Cirsium Oligophyllum (Plant) Extract, Rauwolscine HCl | | |
| Caffeine | 100 mg | * |

* Daily value not established

Other Ingredients: Modified Starch, Gelatin, Vegetable Stearate, Silicon Dioxide, Red 3, Blue 1, Red 40, Titanium Dioxide Color.

Manufactured for USPlabs, LLC (Dallas, TX 75220)

Questions, comments or concerns can be directed to our forums at **www.usplabsdirect.com** or by phone at: **1-800-890-3067** (9-5 EST Mon-Fri)



0 94922 29673 3

L-015-03